**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAN KIM, YONG SEOK KIM, YONG HWA CHUNG KIM, CHUNG KOOK KIM, and DANI BUTLER,<br><br>Plaintiffs,<br><br>v.<br><br>CIRCLE INTERNET GROUP, INC., and CIRCLE INTERNET FINANCIAL, LLC,<br><br>Defendants. | Case No. 1:26-cv-05445-MMG<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS


Page

PRELIMINARY STATEMENT ... 1

STATEMENT OF FACTS ... 4

A. Plaintiffs Obtain a Default Judgment Against North Korea ... 4

B. The Restraining Notice ... 5

C. USDC and Circle ... 5

D. CTS's Cross-Chain Transfer Protocol ... 6

E. The Drift Protocol and Drift Hack ... 7

F. Response to the Drift Hack ... 10

G. This Lawsuit ... 11

LAW AND ARGUMENT ... 11

I. The Restraining Notice Was Ineffective *Ab Initio* ... 11

II. Circle Never Had Actual Possession Of USDC Stolen in the Drift Hack ... 12

A. Under New York Law, the Words *"Possession or Custody"* Mean Actual Possession ... 13

B. The Complaint Does Not Allege That Circle Had Actual Possession of Any USDC Involved in the Drift Hack ... 15

C. Neither Circle Nor CTS Had Actual Possession of the USDC When the Hackers Used CCTP to Bridge It to a Different Blockchain ... 16

III. Circle Was Not Afforded a Commercially Reasonable Opportunity to Restrain Any USDC Involved in the Drift Hack ... 18

IV. Plaintiffs Have Not Alleged Any Damages From The Alleged Violation Of The Restraining Notice ... 19

CONCLUSION ... 21

# TABLE OF AUTHORITIES

Page(s)

## CASES

*AG Worldwide v. Red Cube Mgmt. AG*,
No. 01 Civ. 1228 (GEL),
2002 U.S. Dist. LEXIS 4398 (S.D.N.Y. Mar. 14, 2002) ....11

*Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*,
190 F.3d 16 (2d Cir. 1999)....20

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011)....16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....17

*Aspen Indus., Inc. v. Marine Midland Bank*,
52 N.Y.2d 575 (1981)....19

*Commonwealth of the Northern Mariana Islands v. Canadian Imperial Bank of Commerce*,
21 N.Y.3d 55 (2013),
*aff'd* 717 F.3d 266 (2d Cir. 2013) .... *passim*

*Kim v. DPRK*,
No. 25-mc-527 (S.D.N.Y. 2025)....4, 5

*Ladjevardian v. Republic of Argentina*,
2016 WL 3039189 (S.D.N.Y. May 26, 2016),
*aff'd sub nom. Mohammad Ladjevardian, Laina Corp. v. Republic of Argentina*,
663 F. App'x 77 (2d Cir. 2016) ....20

*U.S. ex rel. Foreman v. AECOM*,
19 F.4th 85 (2d Cir. 2021),
*aff'd*, 2026 U.S. App. LEXIS 8091 (2d Cir. Mar. 19, 2026) ....5

*Zemo Leasing Corp. v. Bank of N.Y.*,
158 Misc. 2d 991 (Sup. Ct., Rockland Cnty., 1993)....18, 19

## STATUTES

CPA § 781....14

CPA § 796....13

## RULES

CPLR § 5222....11, 12, 14, 15

CPLR § 5222(b) ........................................ *passim*

CPLR § 5225 ........................................ 14, 15

CPLR § 5225(b) ........................................ 1, 13, 14

## PRELIMINARY STATEMENT

The Court should dismiss with prejudice this groundless action to recover damages for the alleged violation of a restraining notice served on Circle Internet Financial, LLC ("Circle"). Plaintiffs allege that the notice restrains "all North Korean assets in Circle's *control*," and all "North Korean property that later comes into Circle's *control*." In fact, the restraining notice does no such thing. Nor could it under New York law.

With respect to persons other than a judgment debtor, CPLR 5222(b) permits the restraint of property in the "possession or custody" of that person. As both the text of the statute and the New York Court of Appeals' seminal case construing it demonstrate, the words "possession or custody" mean *actual possession*; the statute does not permit any broader restraint of property.[1] The complaint does not allege that Circle ever had actual possession of any North Korean property, either at the time the restraining notice was served or any later time. Nor can it plausibly be amended to do so. Plaintiffs' claim for violating the restraining notice fails on that basis alone.

Plaintiffs served the restraining notice on Circle in connection with a special proceeding seeking to require Circle to turn over the contents of three cryptocurrency wallet addresses on the Ethereum blockchain in satisfaction of their default judgment against North Korea. Plaintiffs allege that the wallet addresses and USDC contained in them belong to North Korea. Plaintiffs do not allege that Circle has actual possession of the USDC contained in the wallets or that Circle can deliver the USDC to them. Instead, Plaintiffs are purporting to require Circle to provide them with other USDC or an equivalent amount of money, ostensibly pursuant to CPLR

---

[1] *Commonwealth of the Northern Mariana Islands v. Canadian Imperial Bank of Commerce*, 21 N.Y.3d 55, 64 (2013), *aff'd*, 717 F.3d 266 (2d Cir. 2013).

5225(b). Again, because that statute is also confined to the delivery of property in a third party's actual possession, Plaintiffs' attempt to require Circle to "turnover" something else will also necessarily fail.

Before Plaintiffs served the restraining notice, Circle had implemented an "Access Denial" preventing the three wallet addresses from sending or receiving USDC. Perhaps for that reason, the restraining notice refers to the wallet addresses but does not purport to restrain Circle with respect to their contents.

The complaint grossly mischaracterizes the restraining notice, which contains two provisions purporting to restrain Circle. Both provisions are invalid on their face.

The restraining notice's first provision purports to forbid Circle from making or suffering any sale, assignment, transfer or interference in which *Circle* has an interest. CPLR section 5222(b), however, only permits a restraint on property in which the judgment debtor—here North Korea—is known or believed to have an interest. The statute does not permit Plaintiffs' purported restraint of any of Circle's assets, much less all of them.

The restraining notice's second provision purports to restrain Circle with respect to property in which North Korea has an interest coming into Circle's *possession or custody* after service. Under CPLR 5222(b), however, for that forward-looking restraint to be effective, Circle must have been in actual possession of property in which it knew North Korea had an interest at the time of service. Again, Circle did not have actual possession of any USDC contained in the identified wallets or any other wallet in which North Korea had an interest at the time of service, rendering this restraining provision ineffective *ab initio*.

Against this background, Plaintiffs' attempt to obtain a windfall by exploiting the restraining notice is frivolous. They would have this Court require Circle to pay them the

monetary value of what one third party (North Korea) allegedly stole from other third parties (participants in the Drift Protocol). Plaintiffs' theory lacks any basis in law or fact.

The Drift Protocol was a decentralized cryptocurrency exchange. As alleged, over a 30-hour period on April 1-2, 2026, hackers stole approximately $285 million in a mix of cryptocurrencies including 71,415,648 USDC, converted the other assets to USDC, moved them all from the Solana to the Ethereum blockchain, using permissionless, automated bridging software provided by Circle Technology Services, LLC ("CTS"), and then converted the USDC into another cryptocurrency called "Ether" or "ETH."[2] Two months later, long after the assets had been stolen, the Drift Protocol attributed the hack to North Korea.

Circle had nothing to do with this. Moreover, nothing Circle did or failed to do violated, or even implicated, the restraining notice in any way. The complaint should be dismissed for at least the following reasons.

*First*, as discussed above, the restraining notice was invalid and ineffective from the outset.[3] Plaintiffs' claim against Circle for violating the notice therefore necessarily fails. And Plaintiffs' claim against Circle Internet Group, Inc. ("Circle, Inc.") fails because that corporation was not subject to or served with the restraining notice.

*Second*, assuming for the sake of argument that the restraining notice were effective, the complaint does not allege that Circle obtained actual possession of any USDC involved in the

[2] For purposes of this motion, Circle recites the well-pleaded facts alleged in the complaint as if they were true, but many are not. For example, the allegation that Plaintiffs served the restraining notice on defendant Circle Internet Group, Inc. is false. Likewise, according to publicly available information, the hacker-linked wallets no longer held USDC after 7:07 PM ET on April 1, not 6:20 PM ET on April 2, as alleged. In other words, the hack and laundering was completed by the end of the day on April 1, not April 2.

[3] Circle has filed a Motion to Vacate Restraining Notice concurrently herewith.

Drift hack at any time—before, during or after the exploit. Again, the complaint cannot plausibly be amended to do so.

*Third*, subject to the same assumption, the complaint does not plausibly allege any facts that would have afforded Circle a commercially reasonable opportunity to restrain any North Korean USDC involved in the Drift hack that theoretically came into its actual possession.

*Fourth*, the complaint does not allege that any USDC ever came into Circle's actual possession that would have been available to satisfy Plaintiffs' default judgment. Again, the complaint cannot plausibly be amended to do so. As a result, the claim fails for failure to plead any cognizable damages.

For all these reasons, Defendants respectfully request the Court to dismiss Plaintiffs' complaint with prejudice.

## STATEMENT OF FACTS

### A. Plaintiffs Obtain a Default Judgment Against North Korea

In 2015, Plaintiffs Han Kim and Yong Seok Kim obtained a $330 million default judgment against the Democratic People's Republic of Korea ("North Korea"). Compl. ¶ 23.[4] On November 20, 2025, Plaintiffs registered the judgment in this Court. *Id.* ¶ 26; *see also Kim v. DPRK*, No. 25-mc-527 (S.D.N.Y. 2025). Defendant Circle is named as a garnishee in that action. Baskin Decl. ¶ 2 & Ex. 1. Defendant Circle, Inc. is not.

[4] According to the Complaint (¶ 25), the remaining Plaintiffs have also won a default judgment against North Korea, but their request for leave to enforce it is still pending.

### B. The Restraining Notice

On November 26, 2025, Plaintiffs Han Kim and Yong Seok Kim served a restraining notice on Circle. Compl. ¶ 27; *see* Baskin Decl. Ex. 2 (copy of restraining notice).[5] The restraining notice is incorporated here by reference as if set forth in full.

On December 11, 2025, Plaintiffs served a writ of execution on Circle and Circle, Inc. *Kim v. DPRK*, No. 25-mc-527, ECF No. 18 (S.D.N.Y. 2025).

### C. USDC and Circle

USDC is a payment "stablecoin" backed by an equivalent amount of U.S. dollars or dollar-denominated assets that are held in the reserves of Circle and another operating subsidiary of Circle, Inc. Compl. ¶¶ 44–45; USDC Terms at § 1. USDC is widely accessible and transmitted across many cryptocurrency exchanges and blockchain networks. Compl. ¶¶ 48, 51. Circle issues USDC through a process called "minting," pursuant to which qualified clients can buy USDC from Circle in exchange for US dollars. Compl. ¶ 49. Circle will redeem USDC when a qualified institution provides it to Circle in exchange for equivalent US dollars. *Id.* ¶ 50. Circle mints and redeems USDC only to its customers, *i.e.,* those businesses or institutions that have qualified for and obtained a Circle Mint account. *Id.* ¶¶ 52, 58. Neither North Korea, nor any business or institution within that country, is qualified for or possesses a Circle Mint Account. *Id.* ¶ 58. Circle maintains a robust compliance policy to ensure that does not occur. *See id.* ¶¶ 53–57, 59.

---

[5] Because the restraining notice is referenced in the Complaint, it may properly be considered on this Motion. *U.S. ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021), *aff'd*, 2026 U.S. App. LEXIS 8091 (2d Cir. Mar. 19, 2026); Compl. ¶¶ 3, 6, 8, 15–16, 27–32, 145, 148, 153–54, 160–61, 167–70. The other exhibits to the Baskin Declaration—(1) the USDC Terms, (2) the USDC Bridge Terms, (3) a post from third party TRM regarding the Drift hack; and (4) a post from third party Elliptic regarding the Drift hack—are also incorporated by reference into the Complaint. *See* Compl. ¶¶ 45, 70, 128, 129.

USDC is stored in digital wallet addresses on various blockchains. *E.g.*, Compl. ¶¶ 48–49, 65. To access a wallet address, one must know the address's private key. Baskin Decl. Ex. 3, USDC Bridge Terms § 6.9 ("A private key, or a combination of private keys, is necessary to control and dispose of digital assets stored in digital wallets."). Without knowing its private key, Circle cannot retrieve or otherwise access USDC from a wallet address. *Id.* The complaint does not allege that Circle has the private keys for the three wallet addresses identified in the restraining notice, or any of the wallets through which North Korea transmitted USDC during the Drift hack. And the complaint cannot plausibly be amended to do so.

Circle has the technical capability to block individual wallet addresses from sending and receiving USDC, which Circle calls an "Access Denial." Compl. ¶ 60. Circle implements Access Denials pursuant to its Access Denial Policy, which, in most circumstances, requires a valid court order. *Id.* ¶¶ 146, 147. Circle lacks information necessary to identify who owns USDC outside Circle Mint accounts. *Id.* ¶¶ 64, 149. Nor can it determine whether a wallet address is linked to or associated with North Korea. *Id.* ¶ 149. Circle does not "block third parties who are not Circle [Mint Account holders] based only on suspicion." *Id.* ¶ 150.

**D. CTS's Cross-Chain Transfer Protocol**

Persons holding USDC on a blockchain (e.g., the Solana blockchain), may transfer it to a different blockchain (*e.g.*, the Ethereum blockchain) in a process called "bridging." Circle Technology Services, LLC ("CTS"), which is not a defendant in this action, offers software called the Cross-Chain Transfer Protocol ("CCTP") that provides automated bridging technology. Compl. ¶ 66; ¶ 71. CCTP is "permissionless," meaning that any software developer may integrate the CCTP code into its product without authorization from Circle or CTS. *Id.* ¶ 71.

Once a third-party developer integrates CCTP into its application, end users of the application can use it to transfer USDC between blockchains. CCTP works by "burning" USDC on the source blockchain (thereby permanently removing it from circulation) and minting it on the destination blockchain. Compl. ¶¶ 67–68. To use CCTP to bridge USDC, the user identifies USDC in a wallet address on the originating blockchain, causes CCTP to burn it, and identifies a wallet address on the destination chain in which the bridged USDC is to be minted. *Id*.

To ensure that USDC is minted on the destination chain in an amount equivalent to the USDC burned on the source blockchain, CCTP provides an automated programmatic attestation of the USDC that is burned. The user then submits the attestation to the destination blockchain so that the specific amount of USDC burned on the source blockchain will be minted on the destination blockchain. Compl. ¶ 68. The purpose of the attestation is to signify that a burn occurred on the source blockchain, to allow an equivalent mint to occur on the destination chain, ensuring that the amount of USDC in circulation remains the same. *Id.* The complaint does not allege that the attestation has anything to do with approving or disapproving any individual transaction, which CCTP does not do. It cannot plausibly be amended to do so.

The complaint does not allege that CCTP, or Circle, takes actual possession of any USDC transferred between blockchains using CCTP. It cannot plausibly be amended to do so.

**E. The Drift Protocol and Drift Hack**

The Drift Protocol was a decentralized crypto exchange built on the Solana blockchain that "permit[ted] users to deposit crypto assets as collateral to borrow other assets." Compl. ¶¶ 77, 87. "Drift permits borrowers to withdraw assets from Drift only by maintaining collateral whose protocol-recognized value exceeds the value of their borrowed positions." *Id.* As of around March or April 2026, the organizers of the Drift Protocol had appointed a five-member

Security Council to control "max-deposit caps, withdrawal limits, collateral requirements, asset and liability weights, borrowing limits, and liquidation thresholds." *Id.* ¶¶ 91, 92. At the relevant times, approval of two Security Council members was required to make administrative-level changes to the Drift Protocol. *Id.* ¶ 94. Circle is not alleged to have any role in the management of the Drift Protocol or any involvement with the Drift Security Council.

The Drift Protocol was hacked in an incident not involving Circle. According to the Complaint, the hackers approached Drift posing as representatives of a "quantitative-trading firm." *Id.* ¶ 95. On March 30, 2026, the hackers obtained approval from two Security Council members to engage in two transactions that modified the Drift Protocol to provide the hackers with "full administrative privileges on Drift." *Id.* ¶ 101. They did not submit the transactions right away.

In preparation for their scheme, the hackers created a crypto asset called the Carbon Vote Token (CVT). They traded CVT with themselves many times at the consistent price of one dollar, building an extensive, but fake, trading history suggesting that CVT could be valued at one dollar. *Id.* ¶¶ 102, 104.

On April 1, 2026, the hackers executed their scheme. At 16:05 UTC (12:05 p.m. Eastern Time), they submitted the two transactions, giving them complete administrative control over Drift. *Id.* ¶ 103. They altered the Drift Protocol "to permit CVT to be used as collateral for borrowing on Drift and caused Drift to rely on CVT's trading history for its value": one dollar. *Id.* ¶ 104. They "set CVT's borrowing limits to be extremely high and altered Drift's risk parameters to the point where the protocol would not question CVT's value." *Id.* ¶ 105. This took one minute. *Id.* ¶¶ 103–07.

At 16:06 UTC (12:06 p.m. Eastern Time), the hackers deposited 500 million CVT into Drift, which the hacked protocol recognized to be worth $500 million. *Id.* ¶ 106.

One minute later, on April 1, 2026 at 16:07 UTC (12:07 p.m. Eastern Time), the hackers withdrew 18 types of cryptocurrency tokens worth collectively $285 million. *Id.* ¶ 107. $71,415,648.66 was in USDC; the remainder was in other types of cryptocurrency. *Id.* ¶¶ 108, 109. The hackers kept possession of the cryptocurrency, presumably in their own wallets, as they engaged in various transactions to exchange and move the stolen funds. *Id*. ¶¶ 110–16.

The hackers exchanged non-USDC cryptocurrency for USDC. *Id.* ¶ 110. They did so using decentralized exchange (DEX) aggregators, which are protocols that allow a user to swap one crypto asset for another. *Id.* ¶¶ 110–11. Plaintiffs allege the hackers ended up with 232 million USDC. *Id.* ¶ 114.

At 16:27:59 UTC (12:27:59 p.m. Eastern Time), which was 23 minutes after the hack began, the hackers started using CCTP to bridge the 232 million USDC from the Solana to the Ethereum blockchain. *Id.* ¶ 115. Acting with unheard-of "speed and aggressiveness," Baskin Decl. Ex. 4 (TRM Labs April 2 post), the hackers finished bridging the USDC at 23:03:59 UTC (7:03:59 p.m. Eastern Time), Compl. ¶ 115. At that point, the bridged USDC was in wallet addresses used, and presumably owned, by the hackers. The complaint does not allege that the USDC was ever in CTS's actual possession. The complaint does not allege that the USDC was ever in Circle's actual possession.

Once they bridged the USDC to the Ethereum blockchain, the hackers converted the USDC to Ether, which, according to the complaint, finished on April 2, 2026 at 22:20 UTC (6:20

p.m. Eastern Time). By then, all of the stolen cryptocurrency had been converted. Compl. ¶¶ 116, 126.[6]

**F. Response to the Drift Hack**

Plaintiffs allege that North Korea was responsible for the Drift hack. Compl. ¶ 117. But they do not allege that they advised Circle at the time, by a restraining notice or in any other way, that the hack was being committed by North Korea or that the stolen assets were subject to the restraining notice. According to Plaintiffs, on April 2, two blockchain intelligence firms (Elliptic and TRM) "suggested" the hack "was likely" perpetrated by North Korea. Compl. ¶¶ 128, 129; *see* Baskin Decl. Ex. 5 (Elliptic blog post: "Elliptic has identified multiple indicators suggesting that the exploit of Drift Protocol is linked to the Democratic People's Republic of Korea (DPRK)."); Baskin Decl. Ex. 4 (TRM blog post: "TRM's initial investigation suggests the hack was likely perpetrated by North Korean hackers."). But the Complaint does not allege precisely when on April 2 Elliptic and TRM tweeted and blogged their suspicions. Elliptic posted on X at 14:25 UTC (10:25 a.m. Eastern Time). Baskin Decl. Ex. 6 (X post).

By the end of April 1, the hackers had bridged the stolen USDC to the Ethereum blockchain and were finished using CCTP. Compl. ¶ 115.

Eight hours after Elliptic's post on X, at 6:20 p.m. Eastern Time on April 2, the hackers had converted all the USDC to Ether. Plaintiffs do not allege that anyone "conclusively attributed the attack to" North Korea until two months later, on June 3, 2026. Compl. ¶ 127. Nor do Plaintiffs allege that the FBI, U.S. Department of Justice, or any government agency attributed the Drift exploit to North Korea or asked Circle to take any action.

[6] After the hack, the Drift Protocol shut down, with unspecified plans to relaunch at some point.

**G. This Lawsuit**

Plaintiffs filed this lawsuit on June 26, 2026. They allege a single claim for violation of the restraining notice, based on the theory that Circle allowed the hackers to use CCTP and did not *sua sponte* issue Access Denials on the wallet addresses holding the USDC stolen by the hackers before 22:20 UTC (6:20 PM Eastern Time) on April 2. Compl. ¶ 166.

## LAW AND ARGUMENT

For at least four reasons, Plaintiffs' Complaint is groundless and should be dismissed with prejudice.

### I. The Restraining Notice Was Ineffective *Ab Initio*

First, the Court should dismiss Plaintiffs' Complaint because the restraining notice that Circle purportedly violated was legally ineffective, flouting CPLR 5222.

With respect to persons other than a judgment debtor, CPLR 5222(b) permits the restraint of property in which the judgment debtor is known or believed to have an interest, and which is in the actual possession of the person served with the notice at the time of service. CPLR 5222(b). Such a notice may also restrain such property coming into the third party's actual possession after service, but only if the third party was in actual possession of property identified in the notice at the time of service. *Id.* If the third party was not in actual possession of the judgment debtor's property at the time of service, the restraint never takes effect at all. *Id.; see also AG Worldwide v. Red Cube Mgmt. AG*, No. 01 Civ. 1228 (GEL), 2002 U.S. Dist. LEXIS 4398, at *26 (S.D.N.Y. Mar. 14, 2002) ("If the third parties do not have property or debts in which the judgment debtor has an interest, the restraining notices are not effective."); Siegel, N.Y. Prac. § 508 (6th ed.) ("A restraining notice served on a garnishee is effective only if, when served, the garnishee owes a debt to or has property belonging to the judgment debtor. If the

garnishee has such debt or property at that moment, the restraint will apply to that property as well as to all other property "thereafter coming into" the garnishee's possession. If the garnishee lacks any such property or obligation at the moment of service, the restraint never takes effect at all.").

In this case, the restraining notice contains two provisions purporting to restrain Circle, both of which are invalid on their face.

The restraining notice's first provision purports to forbid Circle from making or suffering any sale, assignment, transfer or interference in which *Circle* has an interest. But CPLR 5222 only permits the restraint of property in which the judgment debtor is known or believed to have an interest. Plaintiffs' purported restraint of Circle's assets is beyond the scope of CPLR 5222(b) and therefore invalid.

The second provision purports to restrain Circle with respect to property in which North Korea has an interest coming into Circle's possession or custody after service. This provision was never effective because Circle was not in actual possession of any USDC owned by North Korea at the time of service. As discussed above, and in greater detail in Circle's concurrently filed Motion to Vacate Restraining Notice, that forward-looking restraint would only be effective if Circle were in actual possession of property in which it knew North Korea had an interest at the time of service. Circle was not, rendering this restraining provision ineffective *ab initio*.

## II. Circle Never Had Actual Possession Of USDC Stolen in the Drift Hack

Assuming for the sake of argument that the restraining notice were effective, the complaint does not allege that Circle obtained actual possession of any USDC involved in the Drift hack at any time—before, during or after the exploit. Again, the complaint cannot plausibly be amended to do so.

### A. Under New York Law, the Words *"Possession or Custody"* Mean Actual Possession

A restraining notice against a third party like Circle only covers property "in the possession or custody" of the third party in which the judgment debtor has an interest. CPLR 5222(b). Under New York law, "possession or custody" means actual possession, not control or constructive possession. *Commonwealth of N. Mariana Islands*, 21 N.Y.3d at 61. Even if North Korea obtained a property interest in USDC it stole in the Drift hack, which is far from certain, Circle never had actual possession of that USDC. So Plaintiffs' theory must fail.

In *Northern Mariana Islands*, the Court of Appeals considered a question certified to it by the Second Circuit: whether "a judgment creditor can obtain a CPLR article 52 turnover order against a bank to garnish assets held by the bank's foreign subsidiary." *Id.* at 57. Its answer was no. To reach that conclusion, the *Northern Mariana Islands* court began by interpreting the words "possession or custody" in CPLR Section 5225(b), which governs turnover of a judgment debtor's property not in his or her possession. Section 5222(b), at issue here, governs restraining notices against third parties with respect to such property, and similarly limits the scope of such notices to property in their "possession or custody."

Both Sections 5225(b) and 5222(b) were enacted in 1962 as part of the CPLR, which replaced the Civil Practice Act. Civil Practice Act Section 796 (the predecessor to CPLR Section 5225(b)), provided for turnover of a judgment debtor's property "in the possession or under the control of another person." *Northern Mariana Islands*, 21 N.Y.3d at 61 (quoting Civ. Prac. Act § 796). In enacting Section 5225(b), the legislature removed the word "control," replacing it with "possession or custody." *Id.* "The exclusion of the word 'control' signaled a purposeful legislative modification of the applicable scope of turnover statutes" to the "narrower 'possession or custody' standard" which "contemplates actual possession." *Id.* at 61–63.

*Northern Mariana Islands* applies equally to "possession or custody" in CPLR Section 5222(b). Civil Practice Act Section 781 (the predecessor to CPLR Section 5222(b)), was written narrowly to restrain only a judgment debtor's property in the "possession" of a third party. It did not restrain property in the "control" of a third party but not in its possession. Section 5222(b), by requiring "possession or custody," preserves the narrower restraint.

In fact, the court in *Northern Mariana Islands* expressly applied its interpretation to the "entire CPLR." In construing the meaning of Section 5225(b), the Court of Appeals considered that "related provisions" of the CPLR were enacted to include the "possession and custody" language, while others, especially those involving "expansive rules of disclosure," employ the broader "possession, custody or control" language. *Northern Mariana Islands*, 21 N.Y.3d at 61–62. The court observed that "sections of the CPLR pertaining to the disposition of property," such as 5222 and 5225, utilize the narrower "possession or custody" standard. "This distinction supports the view that the legislature has applied a higher standard to insure the proper disposition of property." *Id*. at 63 (citing sections 5222 and 5225 as among those that "limit the levy of personal property" to items within the "possession or custody" of the defendant). The court concluded that it was "required to construe the entire CPLR in a manner that harmonizes these variations":

> In light of these differences, the most reasonable way to interpret these provisions is to conclude that 'possession, custody or control' contemplates constructive possession, whereas 'possession or custody,' by its omission of the term "control," refers to actual possession.

*Id*.

As discussed below, Circle did not have actual possession of the USDC involved in the Drift hack.

### B. The Complaint Does Not Allege That Circle Had Actual Possession of Any USDC Involved in the Drift Hack

The complaint does not allege that Circle had actual possession of USDC involved in the Drift hack and cannot plausibly be amended to do so. To the contrary, when the hackers withdrew cryptocurrency (including USDC) from the Drift Protocol, they rapidly moved it between their own wallet addresses, not Circle's, to complete the exploit. The USDC remained in the hackers' possession as they bridged it from the Solana to Ethereum blockchain and then converted it to Ether. *See* Compl. ¶¶ 111–16.

The gravamen of Plaintiffs' complaint is not that Circle had actual possession of any wallet address in which North Korea placed the USDC or the USDC itself, but rather that Circle should have issued Access Denials *on the hackers' wallet addresses* (apparently *sua sponte*, with no law enforcement involvement or other legal process). *See* Compl. ¶¶ 123, 166. The complaint expressly (albeit mistakenly) states that the notice restrained "all North Korean assets in Circle's *control*," and all "North Korean property that later comes into Circle's *control*"—statements that ignore New York law, including the Court of Appeals' *Northern Mariana Islands* decision. Compl. ¶ 3.

But Circle's ability to issue an Access Denial to prohibit USDC from being transmitted out of a third party's wallet address is not actual possession of the USDC.[7] It is substantially less than what the defendant bank in *Northern Mariana Islands* was capable of—requiring its foreign subsidiary to turn over the judgment debtor's assets—which the Court of Appeals held

[7] Nor is Circle's ability to implement an Access Denial on a wallet address "control" of the USDC held in that wallet address, but since the language of CPLR sections 5222 and 5225 is limited to "possession and custody," that is an issue the Court need not reach.

insufficient to constitute "possession or custody" under the CPLR. *Northern Mariana Islands*, 21 N.Y.3d at 63.

Because Circle does not have actual possession of the USDC at issue in the Drift hack, Plaintiffs allege that Circle can "change the smart contracts that issue and control USDC at any time and in any way" and from this conclude that Circle could "therefore, make the USDC balance of any wallet address equal whatever Circle wishes it to equal at any time." Compl. ¶ 62. The suggestion that Circle has actual possession of all USDC, everywhere, is frivolous and implausible. The suggestion would also directly contradict Circle and CTS documentation properly considered on this motion. *See, e.g.*, Baskin Decl. Ex. 3, USDC Bridge Terms § 6.1 ("Digital asset transactions are irreversible. If you enter an incorrect, incomplete, or incompatible recipient address (including an address on the wrong Destination Chain), your USDC will be permanently lost. . . . Circle does not control, custody, or have access to your digital assets"); Baskin Decl. Ex. 7, USDC Terms § 13 (Circle cannot "reverse or recall" USDC sent to a "third party USDC address"). Plaintiffs' allegation is therefore not accepted as true. *See, e.g., Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) ("where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true.").

### C. Neither Circle Nor CTS Had Actual Possession of the USDC When the Hackers Used CCTP to Bridge It to a Different Blockchain

Plaintiffs assert that Circle obtained "custody" of the stolen USDC while the hackers used CCTP to bridge it from Solana to Ethereum. Compl. ¶ 69. Again, the allegation is entitled to no weight. But even if it were considered, it would not save Plaintiffs' claim.

First, CCTP is made available by CTS, not Circle. The relationship between Circle and CTS is legally indistinguishable from the relationship between the defendant bank and its foreign

subsidiary in *Northern Mariana Islands*. Accordingly, even in theory, CTS's actual possession of the stolen USDC would be insufficient to establish it by Circle. *Northern Mariana Islands*, 21 N.Y.3d at 63–64.

But the complaint also fails to allege actual possession by CTS. Plaintiffs allege that "according to a security audit published on Circle's website, an address called 'owner' controls all smart contracts involved in CCTP's process and can burn tokens, mint tokens, and send 'arbitrary cross-chain messages' without restriction." From this, Plaintiffs mistakenly conclude that Circle "therefore has custody of all assets in transit" over CCTP. *Id.* ¶ 69. First, the ability of CCTP *software* to perform functions on USDC does not mean that *CTS* or Circle directs those functions. As both the audit itself and Plaintiffs' own allegations reflect, CCTP is a tool that performs functions at the direction of a user. *Id.* ¶¶ 115–16; Baskin Decl. Ex. 8 (audit).

Further, to have "possession or custody" of the USDC, CTS or Circle would have to obtain actual possession of it, not simply be able to perform functions on it, as Plaintiffs allege. *Northern Mariana Islands*, 21 N.Y.3d at 63. Neither CTS nor Circle obtain possession of USDC in transit over CCTP. *See* Baskin Decl. Ex. 3, USDC Bridge Terms § 4 ("At no time does Circle [defined as CTS] hold, control, maintain, operate, custody, or have access to your funds."). In any event, Plaintiffs' legal conclusion that Circle "therefore has custody" is entitled to no weight on this motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Similarly unavailing are Plaintiffs' allegations that Circle should have shut down CCTP to stop the hackers from bridging the USDC from the Solana to the Ethereum blockchain. Compl. ¶ 124. Again, the restraining notice imposes no obligations on Circle with respect to assets in the hackers' possession, not Circle's. And in any event, Plaintiffs do not allege that at

the time the hackers used CCTP, anyone, much less Circle, knew or believed that DPRK was responsible, let alone had obtained property rights in the stolen assets. To the contrary, Plaintiffs allege that the hackers finished using CCTP on April 1 at 7 p.m. Eastern Time (Compl. ¶ 115) and that the first time anyone identified DPRK as even *potentially* involved in the Drift hack was on April 2 (Compl. ¶¶ 128, 129). Plaintiffs have not plausibly alleged that Circle (let alone CTS) possessed or had custody of the stolen USDC, much less when it knew or believed DPRK had an interest in it. CPLR 5222(b).

## III. Circle Was Not Afforded a Commercially Reasonable Opportunity to Restrain Any USDC Involved in the Drift Hack

The complaint does not plausibly allege any facts that would have afforded Circle a commercially reasonable opportunity to restrain any North Korean USDC involved in the Drift hack, even if any had come into its actual possession.

Even if, on April 2, 2026, Circle had learned that DPRK had an interest in the proceeds of the hack, Plaintiffs have still failed to allege any violation of the restraining notice. "[T]he principle of commercial reasonableness should . . . apply in the context of restraining notices so that a bank, albeit with centralized computer services, is afforded a reasonable period of time to process the document and put a hold on the subject account." *Zemo Leasing Corp. v. Bank of N.Y.*, 158 Misc. 2d 991, 993 (Sup. Ct., Rockland Cnty., 1993). In *Zemo*, the defendant bank received a restraining notice on March 4, but did not put a hold on the judgment debtor's bank account until the next day, by which point the debtor had already withdrawn significant funds. The court dismissed the plaintiff's petition against the bank for violating the notice on the ground that "allowing the bank until the close of business the day after receipt of the restraining notice is appropriate." *Id.*

*Zemo* is persuasive authority, and the court's analysis in fact applies with even greater force here. *Zemo* involved the restraint of any identified account of a known customer. Here, Plaintiffs contend that Circle was required to restrain an unstated number of wallet addresses of unknown holders of USDC, across entire blockchains, as a hack was unfolding in real time. But Circle did not receive a restraining notice, or any notice, identifying the stolen USDC. Even if it had learned on April 2 that DPRK held an interest in USDC stolen in the Drift hack, the Complaint does not plausibly allege that Circle could have investigated the hack, determined the affected wallet addresses, and blocked them before the hackers allegedly completed conversion of the USDC into Ether at 6:20 p.m. Eastern Time. To the contrary, the Complaint alleges that Circle does not have the "capacity or remit to identify who owns USDC outside of Circle Mint accounts." Compl. ¶ 64; *see also* Compl. ¶ 149 (Circle "does not make determinations regarding whether a wallet address is linked to or associated with the Democratic People's Republic of Korea or any of its agencies, instrumentalities, or controlled entities; lacks access to information necessary to make any such determination; and does not decide whether to implement Access Denials based on any such determination by Circle"). Accordingly, Circle did not violate the restraining notice.

## IV. Plaintiffs Have Not Alleged Any Damages From The Alleged Violation Of The Restraining Notice

To recover for a violation of the restraining notice, Plaintiffs "must establish that [they] sustained damages as a result of [Circle's] disobedience of the notice. It is necessary, therefore, for the judgment creditor to demonstrate that property of the judgment debtor was available to satisfy the judgment at the time the restraining notice was in effect." *Aspen Indus., Inc. v. Marine Midland Bank*, 52 N.Y.2d 575, 582 (1981).

Plaintiffs have not alleged facts sufficient to support a damages claim. Instead, they allege that "[h]ad Circle complied with the restraining notice by freezing the USDC through access denial and by declining to operate CCTP to move the restrained property, the property would have been preserved and ordered turned over to the Kims." Compl. ¶ 169. But that is wrong for at least two reasons.

First, Plaintiffs could not obtain a turnover order against Circle. Even if Circle had blocked the wallet addresses, it still could not turn over the USDC within them because it does not have actual possession of the contents of those wallets. *Supra* at 15–16; *Northern Mariana Islands*, 21 N.Y.3d at 57 (turnover not available unless garnishee has "actual, not merely constructive, possession or custody of the assets sought"); *see also Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16, 25 (2d Cir. 1999) (vacating turnover order where plaintiff did not proceed "against the person having the ability to produce the asset"); *Ladjevardian v. Republic of Argentina*, 2016 WL 3039189, at *2 (S.D.N.Y. May 26, 2016) (denying turnover under Section 5225(b) where a garnishee did not actually hold the relevant property and thus could not produce it), *aff'd sub nom. Mohammad Ladjevardian, Laina Corp. v. Republic of Argentina*, 663 F. App'x 77 (2d Cir. 2016).[8]

Second, Plaintiffs do not plausibly allege that they could ever obtain the USDC through judicial process directly against DPRK or anyone else.

[8] Plaintiffs also do not and cannot allege that CCTP is the only bridge that would have permitted the hackers to transfer the stolen assets from Solana to the Ethereum blockchain. Thus, even if Circle had been capable of shutting down CCTP as Plaintiffs allege, that would not have stopped the hackers from transmitting the stolen USDC to the Ethereum blockchain and converting it to Ether.

As Plaintiffs do not plausibly allege that they could have obtained a turnover order for the USDC, even had it had been frozen in blocked wallet addresses, they cannot sustain a claim for damages for violation of the restraining notice.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' complaint with prejudice.

Dated: August 28, 2026

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

s/ *John P. Flynn*
John P. Flynn
Colleen Bal (admitted *pro hac vice*)
Joshua A. Baskin (admitted *pro hac vice*)
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2000
Facsimile: (866) 974-7329
Email: jflynn@wsgr.com
Email: cbal@wsgr.com
Email: jbaskin@wsgr.com

*Counsel for Defendants Circle Internet Financial LLC, Circle Internet Group, Inc.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1 the undersigned certifies that this brief contains 6,302 words and complies with the Court's formatting rules.

Dated: August 28, 2026

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

s/ *John P. Flynn*
John P. Flynn
Colleen Bal (admitted *pro hac vice*)
Joshua A. Baskin (admitted *pro hac vice*)
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2000
Facsimile: (866) 974-7329
Email: jflynn@wsgr.com
Email: cbal@wsgr.com
Email: jbaskin@wsgr.com

*Counsel for Defendants Circle Internet Financial LLC, Circle Internet Group, Inc.*