**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| HAN KIM, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 26-cv-5445 |
| CIRCLE INTERNET GROUP, INC. *et al.*, | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 4

I. Background on Circle, Crypto, and USDC .......... 4

A. Circle and USDC .......... 4

B. North Korea's Pattern of Crypto Heists And Laundering Crypto Assets .......... 5

II. This Case .......... 6

A. Plaintiffs' Judgments Against North Korea .......... 6

B. Plaintiffs Serve Circle With a Restraining Notice .......... 7

C. Plaintiffs Move for Turnover of North Korean Assets in Circle's Possession .......... 8

D. Circle Violates The Restraining Notice .......... 8

E. Circle Admits That it Fails to Take *Any* Actions to Prevent Use of USDC by Sanctioned Parties Absent Specific Legal Compulsion .......... 10

ARGUMENT .......... 11

I. Plaintiffs Served Circle With A Valid Restraining Notice .......... 12

A. The Restraining Notice Is Effective Because It Specifically Identified North Korean Assets in Circle's Possession .......... 13

B. Circle Has No Discretion to Ignore a Valid Restraining Notice. .......... 15

II. The Restraining Notice Was Effective Because Circle Possessed or Had Custody of North Korean Assets That It Should Have Restrained .......... 16

A. Circle Is Incorrect that New York Section 5222(b) Requires "Actual Possession" .......... 17

B. Circle Possessed or Had Custody of North Korean Property .......... 20

C. Circle's Possession of North Korea's Interest in The Corresponding Reserve Dollars Can Also Be Restrained ..................... 24

III. Circle At Least Negligently Violated the Restraining Notice ......................... 26

IV. Plaintiffs Were Damaged By Circle's Failure to Restrain North Korean Assets ........................................................................................................ 28

CONCLUSION ........................................................................................ 29

CERTIFICATE OF COMPLIANCE .......................................................... 31

# TABLE OF AUTHORITIES

## CASES

*ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670 (1976) .......... 25, 26

*Aspen Indus., Inc. v. Marine Midland Bank*, 52 N.Y.2d 575 (1981) .......... 10, 11, 15

*Butler v. Democratic People's Republic of Korea*, No. 26-mc-235 (S.D.N.Y. May 21, 2026) .......... 7

*Butler v. DPRK*, No. 20-cv-2514 (D.D.C. Nov. 4, 2025) .......... 7

*Commonwealth of Northern Mariana Islands v. Canadian Imperial Bank of Commerce*, 21 N.Y.3d 55 (2013) .......... *passim*

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462 (2d Cir. 2018) .......... 11, 15

*Fid. Brokerage Servs., LLC v. Bank of China*, 192 F. Supp. 2d 173 (S.D.N.Y. 2002) .......... 13

*GTR Source, LLC v. Zomongo.TV USA, Inc.*, 242 A.D.3d 714 (N.Y. App. Div. 2025) .......... 16

*Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303 (2010) .......... 19, 26

*In re: A Search Warrant For Circle Internet Financial, LLC*, No. 25-031711 (Wis. Cir. Ct. Walworth County Dec. 2, 2025) .......... 16, 21

*Kim v. Democratic People's Republic of Korea*, No. 25-mc-527 (S.D.N.Y.) .......... 7, 8, 28

*Kim v. DPRK*, 774 F.3d 1044 (D.C. Cir. 2014) .......... 6

*Kim v. DPRK*, 87 F. Supp. 3d 286 (D.D.C. 2015) .......... 7

*Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533 (2009) .......... 18

*MacArthur I, Inc. v. Fields*, 188 A.D.3d 493 (N.Y. App. Div. 2020) .......... 18, 19

*Matter of Wimbledon Fin. Master Fund, Ltd. v. Bergstein*, 173 A.D.3d 401 (N.Y. App. Div. 2019) .......... 14 n.6

*May v. Google LLC*, No. 24-cv-01314-BLF, 2026 U.S. Dist. LEXIS 59785 (N.D. Cal. Mar. 20, 2026) .......... 22

*Pan American World Airways, Inc. v. Chemical Bank*, 78 A.D.2d 844 (N.Y. App. Div. 1980) .......... 14 n.6

*Ray v. Jama Prods., Inc.*, 74 A.D.2d 845 (N.Y. App. Div. 1980) .............................. 19

*S & S Mach. Corp. v. Mfrs. Hanover Tr. Co., N.A.*, 219 A.D.2d 249 (N.Y. App. Div. 1996)........................................................................................ 26

*Sanchez v. State of New York*, 99 N.Y.2d 247 (2002) ............................................... 27

*Security Trust Co. of Rochester v. Magar Homes*, 92 A.D.2d 714 (N.Y. App. Div. 1983) ........................................................................................ 26

*State v. Circle Internet Financial LLC*, No. 2026-CM-286 (Wis. Cir. Ct. Walworth County 2026) ........................................................ 2, 3, 23, 24, 29

*Sumitomo Shoji New York, Inc. v. Chem. Bank New York Trust Co.*, 263 N.Y.S.2d 354 (N.Y. Sup. Ct. 1965), *aff'd*, 25 A.D.2d 499 (N.Y. App. Div. 1966) ........................................................................................ 14

*Sykes v. Bank of Am.*, 723 F.3d 399 (2d Cir. 2013)............................................... 1, 15

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001)............................................... 11 n.5

*Trinity Ctr. LLC v. City Nat'l Bank*, No. 651472/2024, 2025 N.Y. Slip Op. 33269(U) (Sup. Ct. N.Y. County Sept. 2, 2025) ............................................ 15

*Verizon New England, Inc. v. Transcom Enhanced Servs., Inc.*, 21 N.Y.3d 66 (2013)........................................................................................ 14

*Wagner v. Chiari & Ilecki, LLP*, 973 F.3d 154 (2d Cir. 2020).................................. 14

*Zemo Leasing Corp. v. Bank of N.Y.*, 158 Misc. 2d 991 (Sup. Ct. Rockland County 1993) ........................................................................ 27

## STATUTES

N.Y. C.P.L.R. § 5222 ........................................................................................ 7

N.Y. C.P.L.R. § 5222(b)........................................................................................*passim*

N.Y. C.P.L.R. § 5225(b)............................................................................ 17, 18, 19

N.Y. U.C.C. § 12-105........................................................................................ 22

## OTHER AUTHORITIES

Letter from Letitia James, Att'y Gen. of N.Y., et al., to Charles E. Schumer, U.S. Sen., et al. (Jan. 26, 2026) ........................................ 2, 23, 29

U.C.C. art. 12 prefatory note 1 (Am. L. Inst. & Unif. L. Comm'n 2022) .................. 22

## PRELIMINARY STATEMENT

Plaintiffs are the family members of Reverend Dong Shik Kim, whom North Korea abducted, tortured, and killed. Plaintiffs hold hundreds of millions of dollars in unsatisfied judgments against North Korea. To enforce those judgments, Plaintiffs served Defendants Circle Internet Financial, LLC, the issuer of the USDC stablecoin, and Circle Internet Group, Inc., its parent company, with a restraining notice specifically identifying North Korean USDC and the fiat reserves backing it. The notice expressly restrained North Korean property thereafter coming into Circle's possession or custody.

Under New York law, Plaintiffs' restraining notice operated as an injunction, which Circle had "no discretion to ignore . . . even if it questions the legal foundation on which the notice is based." *Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013). Yet that is exactly what the Circle defendants—a New York Stock Exchange-listed company and its wholly owned subsidiary—did. More than four months after receiving the restraining notice, Circle stood idly by while North Korea exchanged the proceeds of a massive crypto heist for hundreds of millions of dollars' worth of USDC and then used Circle's products to launder that USDC. For years, North Korea has been the world's foremost crypto thief, and its modus operandi of conducting thefts and laundering assets is well-known. North Korea's theft and subsequent laundering operation followed this pattern. But even though Circle undoubtedly had the power and obligation to freeze North Korea's USDC and stop its laundering operation over the full day that North Korea's laundering operation continued apace,

Circle did nothing. The assets disappeared from Circle's control, and Plaintiffs now cannot execute against them.

Plaintiffs sue Circle for violating the restraining notice, and Circle's primary contention to dismiss the case is that any restraining notice served on it is necessarily ineffective because Circle does not "actual[ly] possess" USDC, an intangible digital asset that Circle acknowledges it can freeze and that the well-pleaded facts of the Complaint show it can move wherever it likes. Dkt. 25 at 12. If the Court accepts Circle's argument, Circle will have *no* obligation to stop North Korea, Iran, or any other terrorist actor from holding USDC, even when Circle has full and complete knowledge that a terrorist state is using USDC to evade sanctions. That argument is audacious from a company that claims to "operate with the transparency, durability, and accountability expected of a leading global financial platform." Circle Internet Group, Inc., 2025 Annual Report at 2. And prosecutors across the country have identified this argument as dangerous and, indeed, criminally contumacious. *See* Ex. B, Criminal Complaint, *State v. Circle Internet Financial LLC*, No. 2026-CM-286 (Wis. Cir. Ct. Walworth County 2026) (bringing criminal-contempt charge against Circle for willfully defying an order requiring it to "invalidate" 381,000 fraudulently obtained USDC by freezing them and reissuing an equivalent amount to the Sheriff); *see also Letter from Letitia James, Att'y Gen. of N.Y., et al., to Charles E. Schumer, U.S. Sen., et al.*, at 5 (Jan. 26, 2026), https://ag.ny.gov/sites/default/files/letters/letter-to-congress-stablecoin-legislation-2026.pdf (identifying Circle's refusal to cooperate with requests to transfer value underlying USDC enabling it to exploit a "loophole to

literally profit from the criminal activity their cryptocurrencies facilitate"). Indeed, in response to a criminal contempt proceeding against it, Circle admitted that it reached "a general agreement" with the United States Department of Justice "on a mechanism for compensating victims in federal investigations through Circle's voluntary agreement to issue new USDC as a substitute for USDC subject to a final order or judgment of forfeiture and a permanent blocklisting order." Ex. D, Motion to Dismiss at 7 n.7, *State v. Circle Internet Financial* (Wis. Cir. Ct. Walworth County, filed June 30, 2026). In other words, Circle has agreed to do exactly what it tells this Court it cannot do: transfer USDC to victims with legal claims to it.

The Court should deny Circle's motion to dismiss. Plaintiffs' restraining notice was effective when served because it identified specific North Korean assets in Circle's possession. And the well-pleaded facts establish Circle's possession or custody because Circle can freeze, mint, and transfer USDC and controls the smart contract governing it. *See* Compl. ¶¶ 60–63, 67–69. New York law does not permit a stablecoin issuer to exercise dominion over an asset while placing it beyond judgment enforcement. Circle was therefore required to freeze the North Korean USDC, failed to do so, and its failure to do so was at least negligent on the well-pleaded facts.

## BACKGROUND

### I. BACKGROUND ON CIRCLE, CRYPTO, AND USDC

#### A. Circle and USDC

Defendants Circle Internet Group, Inc., and Circle Internet Financial, LLC, are two entities formed under Delaware law and headquartered in New York City.[1] *See* Compl. ¶¶ 10–11.[2] Circle issues a crypto asset called USDC in exchange for dollars and redeems USDC on demand in exchange for dollars, always on a one-to-one basis. ¶¶ 44–50. Because Circle backs every USDC with an equivalent amount of U.S.-dollar-denominated assets held, in Circle's own words, "for the benefit of" USDC holders, each USDC is designed to maintain a value of one U.S. dollar—hence the name "stablecoin." *See* ¶¶ 2, 45. One USDC trades for one dollar on crypto exchanges and platforms where crypto assets are sold because of Circle's promise that each USDC is redeemable for one dollar. ¶ 51.

Circle issues USDC on multiple blockchains. ¶¶ 2, 48. Typically, those who hold USDC may send USDC to any wallet address they please. ¶ 65. However, when Circle created USDC, it gave itself the power to freeze the USDC balance of any wallet address, a power Circle calls "access denial" and which, when implemented, causes the USDC balance of a wallet address to equal whatever it equals at the time access denial is implemented until access denial is lifted. ¶ 60. Circle also has the power to

---

[1] Circle Internet Financial, LLC's sole member is Circle Internet Holdings, Inc., a wholly owned subsidiary of Circle Internet Group, Inc. ¶ 11.

[2] All citations are to the Complaint unless otherwise specified.

cause the USDC balance of any blockchain wallet address to equal any amount because Circle unilaterally controls the smart contracts underlying USDC. ¶ 163. Because Circle has the power to unilaterally freeze the USDC balance of any blockchain wallet address and the power to cause the USDC balance of any blockchain wallet address to equal any amount, it can transfer any USDC balance from any address to any other address. ¶ 62.

Circle also transfers USDC between different blockchains. ¶ 43. Specifically, Circle Technology Services, LLC, a wholly owned subsidiary of Circle Internet Group that has no distinct officers, employees, or independent management from Circle Internet Group operates something called the Cross-Chain Transfer Protocol, or "CCTP." ¶ 66. CCTP facilitates USDC transfers between blockchains by burning USDC (permanently removing it from the circulating supply) on the source blockchain (the blockchain on which the USDC is presently held) and minting (or issuing) it on the destination blockchain (the blockchain on which the user wishes to hold USDC). ¶ 67. Circle's terms of service for CCTP make clear that Circle has the power, and is contractually permitted, to "suspend or terminate [the user's] use of [CCTP] at any time for any reason." ¶ 70.

### B. North Korea's Pattern of Crypto Heists And Laundering Crypto Assets

North Korea and its agents (including the hacking organization known as the Lazarus Group) are the world's most prolific known thieves of crypto assets. ¶ 131. North Korea has well-known methods of conducting its heists and laundering the crypto assets it obtains from the heists. The FBI warned that North Korean actors

use "highly tailored . . . social engineering campaigns" targeting employees of decentralized-finance and crypto businesses, and a well-respected private crypto intelligence firm reported that compromises of multi-signature operators predominate among North Korea-linked crypto incidents causing nine-figure losses. ¶¶ 138–40. Once North Korea obtains crypto assets, it commonly trades them for other assets and disperses those assets through decentralized-finance infrastructure and across multiple blockchains. ¶ 139. Its laundering patterns are distinctive: North Korean actors tend to move assets through numerous smaller, batched transactions, generally below $500,000, rather than the larger tranches favored by other illicit actors. ¶ 141. And North Korea has previously laundered stolen crypto through USDC: after a 2023 hack, North Korean operatives exchanged approximately $100 million in stolen crypto assets for USDC and other stablecoins before swapping those assets again—a pattern that intelligence firms have described as a "hallmark" of recent North Korean exploits. ¶ 142.

## II. THIS CASE

### A. Plaintiffs' Judgments Against North Korea

In 2000, Reverend Dong Shik Kim, a U.S. permanent resident, was abducted by a member of the North Korean security services and secreted across the border into North Korea. *Kim v. DPRK*, 774 F.3d 1044, 1049 (D.C. Cir. 2014). Kim "suffered an untimely death" resulting "from torture and malnutrition . . . deliberately caused by his North Korean captors." *Id.* at 1050–51.

In two separate proceedings, the Kim family sued North Korea for the abduction and murder of Reverend Kim and obtained a total of $96,000,000 in

compensatory damages and $600,000,000 in punitive damages. *See Kim v. DPRK*, 87 F. Supp. 3d 286, 291 (D.D.C. 2015); *Butler v. DPRK*, Dkt. No. 31, 20-cv-2514 (D.D.C. Nov. 4, 2025). On November 20, 2025, the Kims registered their judgments in this Court, AO-451, *Kim v. Democratic People's Republic of Korea*, No. 25-mc-527 (S.D.N.Y. Nov. 20, 2025), and on May 21, 2026, the *Butler* plaintiffs did the same, AO-451, *Butler v. Democratic People's Republic of Korea*, No. 26-mc-235 (S.D.N.Y. May 21, 2026).

### B. Plaintiffs Serve Circle With a Restraining Notice

On November 26, 2025, Plaintiffs separately served restraining notices pursuant to C.P.L.R. Section 5222 on Circle Internet Group, Inc., and Circle Internet Financial, LLC.[3] *See* Ex. A, Proof of Service. The notices informed both entities of Plaintiffs' judgment against North Korea, the registration of that judgment in this District, and the Court's authorization of execution. Plaintiffs identified three wallet addresses subject to the restraint and specified the restraint of all North Korean property including USDC, interests in Circle's U.S. cash reserves, and other assets or interests of North Korea and its instrumentalities and agents. The restraining notices expressly covered "all property in which the above-named Judgment Debtor has an interest hereafter coming into your possession or custody." Ex. A at 4, 8.

[3] Defendants' claim that Plaintiffs did not serve Circle Internet Group, Inc., with a restraining notice is false. *Compare* Dkt. 25 at 3 n.2, *with* Ex. A.

### C. Plaintiffs Move for Turnover of North Korean Assets in Circle's Possession

On December 12, 2025, Plaintiffs moved for turnover of North Korean property held by Circle. *See* Dkt. 4, *Kim v. Democratic People's Republic of Korea*, No. 25-mc-527. Plaintiffs' motion targeted 2,522,419 USDC in the three wallet addresses in their restraining notice. *See id.* at 1–2. That motion will soon be fully briefed.

### D. Circle Violates The Restraining Notice

On April 1, 2026, North Korean state agents exploited Drift, a crypto-trading protocol built on the Solana blockchain, by obtaining the signatures of two members of Drift's five-member Security Council and using those signatures to seize administrative control of the Drift protocol. ¶¶ 77, 92–101, 103–09. The attack followed a playbook that, by then, was well associated with North Korea. *E.g.*, ¶¶ 137–38, 140. Within minutes, North Korea obtained $285 million in crypto assets. ¶¶ 103–09. The laundering that followed bore additional hallmarks of prior North Korean operations. ¶¶ 141–42.

Shortly after obtaining assets from Drift, North Korea used decentralized exchanges to sell them in small batches for approximately 232 million USDC. ¶ 110. North Korea then used Circle's CCTP in more than one hundred separate transactions over approximately six-and-a-half hours to transfer the USDC to other blockchains. ¶¶ 110–15.

Within approximately two hours of the initial thefts—while North Korea still possessed USDC—the chief executive of a prominent crypto company publicly called for "someone from Circle" to "reach out asap," reporting a "high likelihood of a

potentially large exploit" and then identifying Drift as the apparent victim. ¶ 119. Less than forty minutes later, observers were publicly tracking the attacker's sale of the stolen assets for USDC and movement of that USDC to Ethereum. ¶ 120. Drift itself soon announced that it was experiencing an "active attack" and was coordinating with "security firms, bridges, and exchanges" to contain the attack; Circle was among the entities Drift contacted. ¶¶ 121–22. And as the transfers continued, observers reported that the Drift exploiter was bridging USDC to the Ethereum blockchain using Circle's CCTP service. ¶ 120.

Despite the warning signs and outcry, Circle did nothing. The attackers used CCTP for *seven hours* and conducted more than *one hundred* separate bridging transactions. ¶ 115. Five hours after the exploit began, North Korea still held approximately 50 million USDC. ¶ 126. It was not until April 2, 2026, that North Korea finished exchanging its USDC for Ether.[4] *Id.* That same day, multiple crypto intelligence firms published reports announcing that North Korea was behind the heist based on information already known on the day prior. ¶¶ 128–29.

To summarize: a nine-figure exploit displaying multiple characteristics of known North Korean operations and that was immediately identified as a North Korean operation was being publicly tracked as the attacker converted stolen assets

[4] Circle disputes this as a factual matter, asserting that "the hack and laundering was completed by the end of the day on April 1, not April 2." Dkt. 25 at 3 n.2. Of course this Court accepts the well-pleaded facts of the Complaint as true regardless, but anyways Circle is wrong. *See* Etherscan, 0x21932be9a, *available at* https://etherscan.io/tx/0x21932be9a18f508ee6f71e7b7c5dfd6190ed168fb3e058833c920a3cac9451f4.

into Circle's stablecoin and repeatedly used Circle's own cross-chain infrastructure to move it, ¶¶ 115, 118–26, 137–44, and Circle did nothing to stop it.

### E. Circle Admits That it Fails to Take *Any* Actions to Prevent Use of USDC by Sanctioned Parties Absent Specific Legal Compulsion

Since the incident, Circle has publicly explained why it did not act to freeze the North Korean assets: it does not take *any* steps to prevent use of USDC by sanctioned states or terrorist parties unless in response to specific legal compulsion or unless Circle is itself the buyer or seller of the USDC. Circle's Chief Strategy Officer claimed that Circle freezes USDC only when "legally compelled by an appropriate authority, through lawful process," and its CEO similarly explained that Circle acts at the direction of law enforcement or courts rather than deciding on its own whether to freeze a wallet. ¶¶ 146–47. Of course, even those explanations fail to explain why Circle did not even attempt to comply with the restraining notice here, which in fact is "lawful process" equivalent to a court order under New York law. *Aspen Indus., Inc. v. Marine Midland Bank*, 52 N.Y.2d 575, 579 (1981) (restraining notices "serve as a type of injunction"). But, to be clear, if Kim Jong Un himself walked into Circle's office and said "I own wallet address XYZ, which contains 100 million USDC," Circle's *admitted* policy is to do nothing at all in response to that information and instead to continue earning interest on the reserves backing Kim Jong Un's USDC and allowing him to benefit from his holdings.

Circle's stated policy embodies its longstanding willful blindness to who is using its services. On May 27, 2026, well after Plaintiffs served Circle with a restraining notice, Circle represented at a hearing in this Court that Circle is not

"doing any internal investigations using its own resources to try to identify wallets that are associated with North Korea." ¶ 148. And Circle represented in a sworn response to a subpoena that it "does not make determinations regarding whether a wallet address is linked to or associated with the Democratic People's Republic of Korea or any of its agencies, instrumentalities, or controlled entities; lacks access to information necessary to make any such determination; and does not decide whether to implement Access Denials based on any such determination by Circle." ¶ 149.

## ARGUMENT

Circle had a legal obligation to restrain North Korean assets and ample opportunity to do so, and it is liable because it failed to. *See Aspen Indus.*, 52 N.Y.2d at 580 (explaining that violating a restraining notice "subjects the garnishee to . . . liability"). To make out a claim for a violation of a restraining notice, Plaintiffs must show that (1) they served Circle with an effective restraining notice, (2) that Circle violated that notice at least negligently and (3) Plaintiffs were damaged as a result.[5] *See CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 471–73 (2d Cir. 2018).

The Complaint plausibly alleges that all three elements are met. Plaintiffs served Circle with a valid and effective restraining notice because the notice specifically identified North Korean property in Circle's possession or custody and

[5] This Court applies the well-known plausibility standard in evaluating Circle's motion. *Todd v. Exxon Corp.*, 275 F.3d 191, 197 (2d Cir. 2001) (explaining that on a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true").

restrained any additional North Korean property thereafter coming into Circle's possession or custody. Once served with the notice, Circle was obligated to freeze North Korea's USDC because Circle has complete dominion over USDC and possesses fiat reserves "for the benefit of" USDC holders like North Korea. But Circle has a policy of not freezing USDC absent direct legal compulsion, and so when North Korea held hundreds of millions of USDC after a sophisticated hack, Circle did nothing despite the clear warning signs that North Korea held that USDC. Circle's failure to freeze those funds was worse than negligent on the pleaded facts, and Circle's negligence damaged Plaintiffs because it allowed the USDC that Plaintiffs would have collected to dissipate.

## I. PLAINTIFFS SERVED CIRCLE WITH A VALID RESTRAINING NOTICE

Plaintiffs served both Circle entities with a valid and effective restraining notice. Under New York law, a restraining notice served on a garnishee is effective if either: (1) "at the time of service," the garnishee is "in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest," or (2) the restraining notice states "that the judgment debtor . . . has an interest in specified property in the possession or custody of the person served." N.Y. C.P.L.R. § 5222(b). Both pathways are met because Plaintiffs' restraining notice named North Korea as their judgment debtor, requested that Circle restrain all North Korean assets, and identified North Korean USDC in three specific wallet addresses. ¶¶ 29–30. Circle nonetheless contends that the restraining

notices were ineffective *ab initio*, Dkt. 25 at 11–12, but its arguments are without merit.

### A. The Restraining Notice Is Effective Because It Specifically Identified North Korean Assets in Circle's Possession

Circle argues that Plaintiffs' restraining notice is invalid because it purported to restrain Circle's property, rather than North Korea's, and ineffective because Circle lacked possession of North Korean property when Plaintiffs served the notice. *See* Dkt. 25 at 12. Circle's argument is not only wrong on its own terms, but it also ignores that New York law provides *two* independent ways for a restraining notice served on a garnishee to be effective. Circle focuses only on Section 5222(b)'s provision that a notice will bind a garnishee that, "at the time of service," possesses or has custody of property in which it "knows or has reason to believe the judgment debtor . . . has an interest." N.Y. C.P.L.R. § 5222(b). But Section 5222(b) provides a second, independent basis for restraint that Circle never acknowledges: a notice is effective if it states that "the judgment debtor . . . has an interest in specified property in the possession or custody of the person served." N.Y. C.P.L.R. § 5222(b).

Plaintiffs' restraining notices specifically identified North Korean property in Circle's possession or custody. As Circle itself acknowledged, "the restraining notice identifies three wallet addresses that Plaintiffs contend contain USDC owned by North Korea." Dkt. 30, Marathakis Decl. ¶ 9; *see also* Ex. A at 4, 8. A "'judgment creditor's specification of debt or property in a restraining notice is binding on the person served . . . except pursuant to an order of the court,'" and Circle did not seek such an order until *nine months* after it was served with the restraining notice. *Fid.*

*Brokerage Servs., LLC v. Bank of China*, 192 F. Supp. 2d 173, 181 (S.D.N.Y. 2002) (quoting *Sumitomo Shoji New York, Inc. v. Chem. Bank New York Trust Co.*, 263 N.Y.S.2d 354, 357–58 (N.Y. Sup. Ct. 1965)), *aff'd*, 25 A.D.2d 499 (N.Y. App. Div. 1966); *see also Wagner v. Chiari & Ilecki, LLP*, 973 F.3d 154, 157 (2d Cir. 2020). Because Plaintiffs specifically identified North Korean property in Circle's possession or custody, the restraining notice was valid and covered all future North Korean property that came into Circle's hands. *See Verizon New England, Inc. v. Transcom Enhanced Servs., Inc.*, 21 N.Y.3d 66, 70 (2013) (explaining that, upon service of a restraining notice, all judgment debtor property that "thereafter comes into the possession or custody of [the garnishee] is subject to" that notice).[6]

[6] As described above, the restraining notice was valid for reasons independent of the supposed error that Circle focuses on. But to be clear, Circle's argument that Plaintiffs restrained the wrong entity's property is unavailing because New York courts look to the garnishee's knowledge and reasonable understanding of the restraint, rather than treating a drafting error or omission as fatal. *See, e.g., Pan American World Airways, Inc. v. Chemical Bank*, 78 A.D.2d 844, 844 (N.Y. App. Div. 1980) (even where a judgment creditor's restraining notice to a bank named the wrong judgment debtor, restraining notice not vacated where there is "a factual issue [] presented as to whether defendant bank knew, or had reason to believe, that its depositor and the judgment debtor were of the same equity."); *Matter of Wimbledon Fin. Master Fund, Ltd. v. Bergstein*, 173 A.D.3d 401, 402 (N.Y. App. Div. 2019) (even though the restraining notice "did not specify the settlement proceeds" that belonged to the judgment debtor, the garnishee was "sufficiently aware" that the judgment debtor had an interest in the settlement proceeds and thus the garnishee could be held in contempt). The restraining notice specifically identified North Korea as the judgment debtor and North Korean property as the subject of the restraint, and Circle fully understood that, *see, e.g.*, Dkt. 30, Marathakis Decl. ¶¶ 6–11. And even if it *didn't* understand that, it should have moved to modify the restraint, as explained below.

### B. Circle Has No Discretion to Ignore a Valid Restraining Notice.

Both law and equity bar Circle's attempt to escape liability for violating the restraining notice by arguing that the notice is invalid. *See* Dkt. 25 at 11–12. By operation of New York law, a restraining notice is a self-executing injunction, not a request for voluntary compliance. As set forth in Section 5222(b), a garnishee served with a restraining notice "is forbidden to make or suffer any sale, assignment or transfer of, or any interference with" the property restrained. N.Y. C.P.L.R. § 5222(b). Thus, "the restraining notice serves as a type of injunction prohibiting the transfer of the judgment debtor's property," *Aspen Indus.,* 52 N.Y.2d at 579, and "[a] garnishee has no discretion to ignore a restraining notice that is valid on its face . . . even if it questions the legal foundation on which the notice is based." *Sykes*, 723 F.3d at 406.

But rather than comply with the restraining notice and contest it if Circle believed it to be invalid, Circle simply ignored it. Although Circle is "entitled to contest the validity" of the restraining notice in a court of law, it is "not free to simply ignore [its] injunctive effect." *CSX*, 879 F.3d at 472. "The proper remedy for an allegedly improper or overbroad restraining notice is to move to vacate or modify it, not to disregard it." *Trinity Ctr. LLC v. City Nat'l Bank*, No. 651472/2024, 2025 N.Y. Slip Op. 33269(U), at *5 (Sup. Ct. N.Y. County, Sept. 2, 2025). Yet, months after disregarding the restraining notice and permitting North Korea to transfer hundreds of millions of dollars' worth of USDC, Circle now challenges the notice's effectiveness. Dkt. 25 at 11–12; Dkt. 28. Circle may not disregard the restraint, allow North Korea to disburse the restrained property, and then, months later, ask this Court to retroactively bless its decision.

Moreover, Circle's argument that the notice is invalid is barred by the doctrine of laches. *See GTR Source, LLC v. Zomongo.TV USA, Inc.*, 242 A.D.3d 714, 718 (N.Y. App. Div. 2025) ("Laches is applicable where there has been a considerable delay resulting in a change of position, intervention of equities, loss of evidence, or other disadvantages"). Circle waited more than nine months to challenge the restraining notice. In the interim, Plaintiffs reasonably expected Circle to restrain North Korean assets. Evidently, Circle disregarded the notice, believing it to be completely ineffective. Given Plaintiffs' reasonable reliance that Circle would follow the law and challenge a restraining notice that it believed to be ineffective, Plaintiffs would be prejudiced by the restraining notice being vacated for any remediable defect that Circle could have raised earlier but chose not to.

## II. THE RESTRAINING NOTICE WAS EFFECTIVE BECAUSE CIRCLE POSSESSED OR HAD CUSTODY OF NORTH KOREAN ASSETS THAT IT SHOULD HAVE RESTRAINED

Circle's primary argument is that it could not have violated the restraining notice because it lacked "actual possession" of the USDC that North Korea acquired in the Drift exploit and subsequent laundering operation. *See* Dkt. 25 at 12–18. Circle's argument is an extreme one—it does not, for purposes of this motion, dispute that North Korea held USDC, but Circle nonetheless argues it cannot be held liable because it did not "possess" a stablecoin that it can freeze, mint, and thus effectively transfer, and for which it holds the private keys, allowing it to do *anything* it wants. As both courts and lawmakers are starting to recognize in the wake of Circle's nationwide repetition of this fiction, the argument is wrong under established law and dangerous too. *See* Ex. C, *In re: A Search Warrant For Circle Internet Financial,*

*LLC*, No. 25-031711 (Wis. Cir. Ct. Walworth County, Dec. 2, 2025) at 7 (issuing warrant ordering Circle to invalidate and reissue USDC). If this Court accepts Circle's argument that Circle lacks possession of a digital asset it can freeze, mint, and transfer, Circle would be permitted to freely ignore North Korea's use of USDC—or the use by any other rogue nation or terrorist organization. Nor would Circle *ever* have to comply with lawful turnover orders that would require it to do what every other regulated financial institution must do: turn over property held by terrorist or criminal parties. The Court should reject Circle's invitation to adopt a bespoke legal rule allowing Circle alone to operate with impunity.

Circle argues that it "never had actual possession" of North Korea's USDC, so its failure to freeze that USDC cannot make it liable for violating Plaintiffs' restraining notice. Dkt. 25 at 13. This is wrong on the law (because "actual possession" is not required) and on the pleaded facts (because Circle did indeed have "actual possession" of North Korean property interests even if that were required).

### A. Circle Is Incorrect that New York Section 5222(b) Requires "Actual Possession"

New York law does not require that a garnishee "actually possess" a judgment debtor's assets for that garnishee to violate a restraining notice. Circle's "actual possession" rule applies to *turnover* actions governed by a different provision, Section 5225(b), under which the garnishee must necessarily have actual possession or custody of the judgment debtor's property to turn it over. But New York courts have rejected the "actual possession" rule in the Section 5222(b) restraining notice context because a garnishee that lacks actual possession may nevertheless have sufficient

authority over the judgment debtor's property to prevent its transfer. *See MacArthur I, Inc. v. Fields*, 188 A.D.3d 493, 494–95 (N.Y. App. Div. 2020) (rejecting the "actual possession" rule for Section 5222(b) cases).

Circle derives its "actual possession" theory from *Commonwealth of Northern Mariana Islands v. Canadian Imperial Bank of Commerce*, 21 N.Y.3d 55 (2013), where a judgment creditor sought turnover of the judgment debtor's assets from a garnishee that did not itself possess the assets. Instead, the garnishee's partially owned foreign subsidiary, with no presence in New York or the United States, possessed the judgment debtor's property. *Id.* at 58. The judgment creditor argued that turnover was nonetheless proper because the garnishee had "the control, power, authority, and practical ability to order" its subsidiary to turn over the judgment debtor's funds. *Id*. The New York Court of Appeals rejected that argument and held that "a section 5225(b) turnover order cannot be issued against a garnishee lacking actual possession or custody of a judgment debtor's assets or property." *Id.* at 63. This holding makes sense because a garnishee in a turnover action cannot turn over property it neither possesses nor has custody of, and a New York court cannot issue a turnover order "requir[ing] that a garnishee be compelled to direct another entity, which is not subject to [New York's] personal jurisdiction, to deliver assets held in a foreign jurisdiction." *Id.* at 64; *see also Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 540 (2009) (explaining that "the key to the reach of the turnover order is personal jurisdiction over a particular defendant"). As the Court of Appeals recognized, "[s]uch

an expansion is inconsistent with the plain language and scope of section 5225(b)." *Northern Mariana*, 21 N.Y.3d at 64.

But New York courts have already expressly rejected extending *Northern Mariana*'s "actual possession" rule to restraining notices. In *MacArthur,* although the garnishee "did not have actual possession over the account" and relied on *Northern Mariana* to argue it was not bound by the restraining notice, the court nonetheless held that the garnishee had to comply with that notice. 188 A.D.3d at 495. As the *MacArthur* court explained, "[t]he distinguishing factor between a CPLR 5225 proceeding [for turnover] and the enforceability of a CPLR 5222(b) restraint is that a turnover proceeding requires the physical ability to produce the assets sought, which, *unlike here*, necessarily requires actual possession." *Id.* at 495–96 (emphasis added).

Rather than looking to "actual possession," the enforceability of a restraining notice as to specific property "requires an examination of the relationship between the judgment debtor and the specific property involved." *Id.* at 494–95. This accords with New York's "practical approach" to judgment enforcement, under which creditors may reach "any property interest the judgment debtor may have, whether [real or personal,] tangible or intangible, which could be assigned or transferred." *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 313 (2010) (citation omitted) (alterations in original); *see also Ray v. Jama Prods., Inc.*, 74 A.D.2d 845, 845–46 (N.Y. App. Div. 1980) (holding that a garnishee may not evade a restraining notice by contracting with the judgment debtor's employer instead and explaining that garnishees "may not circumvent the mandates of a restraining notice by claiming that

the judgment debtor has no interest in the money merely because he will not acquire physical possession of such money"). Under this view, there is no question that Circle had possession or custody of the North Korean USDC and their underlying fiat reserves because Circle had the power to freeze that USDC and prevent its transfer, thus enabling its collection by Plaintiffs. This Court should deny Circle's motion on this basis alone.

### B. Circle Possessed or Had Custody of North Korean Property

Circle's argument that a garnishee cannot be liable for violating a restraining notice unless the garnishee "actually possessed" North Korea's property fails even on its own terms because Circle did, in fact, actually possess North Korean assets. *See* Dkt. 25 at 12–18. Thus, even if *Northern Mariana* supplied the governing standard, this Court should hold that Plaintiffs have plausibly alleged that Circle had actual possession or custody of North Korean property because Circle possesses or has custody of *every* USDC coin that it issues and fully controls. This is true for two reasons.

First, Circle concedes that it has "the technical capability to block individual wallet addresses from sending and receiving USDC," Dkt. 25 at 6, and it accepts that it can mint USDC, *id.* at 7. A frozen USDC balance is worthless and is publicly known to be worthless. ¶¶ 60–61. This means that Circle can transfer the economic interest in every single USDC it issues by (1) freezing the balance at one wallet address, which renders that balance worthless, and (2) causing an equivalent amount of USDC to be minted at another wallet address. ¶¶ 2, 26, 30, 60–63, 160; *see also* Dkt. 25 at 7 (conceding that CCTP can burn USDC). Circle quibbles that it can't "move" any given

USDC because the USDC balance at the second wallet address is "reissue[d]" not "transfer[red]." That is like saying Wells Fargo cannot "move" bank balances between its customers because to do so it must make one customer's balance zero and—hey, presto!—"reissue" *new* balances. That is self-evidently wrong, as at least one court has recognized. *In re: A Search Warrant For Circle Internet Financial, LLC*, No. 25-031711 at 9.

Second, the Court accepts as true the allegation that Circle has the unqualified power to change its smart contracts, ¶ 62, and thus Circle can, in every possible sense of the word "move," move a USDC balance from one address to another. *Id.* Circle somehow claims that this is factually untrue, but (a) Circle provides no evidence that it is (one searches its exhibits in vain for any explanation of an *external* restriction on Circle's ability to change its smart contracts to be like its competitor Tether's, *see* Dkt. 26, Baskin Decl. Ex. 8 at 4 (explaining that CCTP's "core contract[]" is "fully controlled by an admin role")), and (b) this Court accepts Plaintiffs' well-pleaded facts as true regardless. Circle can cause every single USDC balance anywhere to move from one address to another; if that is not "possession or custody," it is hard to imagine what would be.

Circle's ability to freeze and transfer (or, equivalently, reissue) USDC reflects precisely the kind of relationship with property that New York regards as sufficient to establish "actual possession" or custody. Circle argues that mere "control" over assets is insufficient, relying again on *Northern Mariana*, and assuming—but not explaining—that control is different from possession in this context. Dkt. 25 at 13–

14. But *Northern Mariana* did not hold that control can *never* amount to possession or custody; it held only that control *over a foreign entity* possessing assets is insufficient where that entity is outside the court's jurisdiction. *See Northern Mariana*, 21 N.Y.3d at 64 (explaining that "many cases have held that a turnover order is given effect through a court's exercise of personal jurisdiction over a party" and that "[n]o case supports the Commonwealth's attempt to . . . require that a garnishee be compelled to direct another entity, which is not subject to this state's personal jurisdiction, to deliver assets held in a foreign jurisdiction"). That Circle itself had the ability to freeze North Korea's USDC and effectively turn over North Korea's USDC to Plaintiffs is sufficient evidence of "actual possession" or custody, especially where the USDC at issue are controllable electronic records. *See* N.Y. U.C.C. § 12-105(a) (defining control of a controllable electronic record); *id.* (b) (explaining that a party can have control even if another party also has control) U.C.C. art. 12 prefatory note 1 (Am. L. Inst. & Unif. L. Comm'n 2022) (explaining that, in the context of controllable electronic records, "control" is "the functional analogue of possession of tangible personal property such as goods").

Circle's dominion over USDC establishes its actual possession or custody over USDC. Put differently, because USDC are fully controlled electronically by Circle, they are akin to electronic gift card balances that are *always* within the company's control. *See May v. Google LLC*, No. 24-cv-01314-BLF, 2026 U.S. Dist. LEXIS 59785, at *53–54 (N.D. Cal. Mar. 20, 2026) (holding that Google "had possession" of gift-card funds based on its control over funds after redemption into Google Play accounts).

Circle calls the argument that it "has actual possession of all USDC" "frivolous and implausible," Dkt. 25 at 16, but Circle's denial of reality, both here and in other fora, is factually wrong and legally dangerous, as courts and legislators are starting to see. In a blistering letter sent in January 2026 to three U.S. Senators, the Attorney General of New York and the District Attorneys of the Counties of New York, Queens, Westchester, and Nassau explained that "Circle . . . has the ability to freeze USDC, but they disclaim any ability to burn and reissue frozen funds and claim that they cannot do so under their protocol." *Letter from Letitia James, Att'y Gen. of N.Y., et al., to Charles E. Schumer, U.S. Sen., et al.*, at 5 (Jan. 26, 2026), https://ag.ny.gov/sites/default/files/letters/letter-to-congress-stablecoin-legislation-2026.pdf. But "[t]he protocol that Circle uses is one of its own design," *id.* at 5 n.2, so Circle's claim to be unable to help law enforcement or victims is like a spouse saying he can't do the dishes tonight because he's tied his own hands behind his back. It's an excuse to get out of an unwanted chore, not an actual limitation. And that excuse creates a "loophole to literally profit from the criminal activity their cryptocurrencies facilitate." *Id.*

A recent court proceeding in Wisconsin illustrates the absurd hair-splitting in which Circle has been engaged—and which this Court must reject. There, prosecutors brought criminal contempt charges after Circle defied an order requiring it to "invalidate" 381,000 fraudulently obtained USDC by freezing them and reissuing an equivalent amount to the Sheriff. *See* Ex. B, Criminal Complaint ¶ 8, *State v. Circle Internet Financial LLC*, No. 2026-CM-286 (Wis. Cir. Ct. Walworth County 2026).

Circle refused not on technical grounds but because per "the terms of its *own contracts*, it will not 'burn and reissue' USDC." *Id.* ¶ 10 (emphasis added). But, after facing criminal charges, Circle announced "a general agreement" with the United States Department of Justice "on a mechanism for compensating victims in federal investigations through Circle's voluntary agreement to issue new USDC as a substitute for USDC subject to a final order or judgement of forfeiture and a permanent blocklisting order." Ex. D, Motion to Dismiss at 7 n.7, *State v. Circle Internet Financial* (Wis. Cir. Ct. Walworth County filed June 30, 2026). Given Circle's commitment to issue new USDC to compensate the fraud victims, Wisconsin dropped the criminal case against Circle.

For Circle to call *Plaintiffs'* theory of possession "frivolous" is, thus, pure chutzpah. Circle has begun to comply (through gritted teeth) with law enforcement requests that recognize the reality that Circle can in fact fully control all USDC. That means it can comply—and has complied—with orders to both (1) restrain identified USDC and (2) turn over USDC to victims just like the Plaintiffs. And now it has the audacity to claim here that it never possessed the identified North Korean assets sufficiently to restrain them so that the Kims could do the *exact same thing* as those other victims have done. That argument should be rejected.

### C. Circle's Possession of North Korea's Interest in The Corresponding Reserve Dollars Can Also Be Restrained

In the alternative or in addition to the USDC themselves, Circle also possessed fiat reserves for North Korea's benefit that could be restrained because each USDC represents a specific interest in one dollar that Circle holds in reserve. Circle's terms

provide that "USDC is fully backed by an equivalent amount of U.S. Dollar-denominated assets held by Circle . . . on behalf of, *and for the benefit of*" those who hold USDC—here, North Korea. ¶¶ 2, 46. Thus, when North Korea held USDC, it held an asset representing an interest in fiat reserves that Circle possesses. ¶ 46. But because Circle did not freeze the USDC, North Korea's interest in those reserves dissipated.

Circle's argument that it will redeem USDC only "when a qualified institution provides it to Circle," Dkt. 25 at 5, is a red herring because when North Korea held USDC, it held an assignable interest in Circle's fiat reserves. True, Circle would not redeem USDC directly to North Korea. ¶¶ 53–54. But Circle admits that although the "vast majority of USDC . . . outstanding are not held by Circle Mint customers [that is, those who redeem directly with Circle], the USDC . . . issued continue to represent an obligation for the Company to redeem each USDC . . . issued for 1 U.S. dollar." Letter from Circle Internet Financial Ltd. to U.S. Sec. & Exch. Comm'n, at 43 (Apr. 12, 2024), https://www.sec.gov/Archives/edgar/data/1876042/000095010324005276/filename1.htm; *see also* ¶¶ 50–52. Had Circle frozen North Korea's USDC, North Korea would continue to hold an assignable intangible interest in Circle's fiat reserves, which New York law has long recognized as "property" subject to judgment enforcement. *See ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 674–76 (1976) (explaining that a contractual right to future, unrealized profits constituted attachable property because the right was assignable, notwithstanding uncertainty about whether it would ultimately have any value);

*Hotel 71 Mezz Lender LLC*, 14 N.Y.3d at 313–14 (explaining that, in *ABKCO*, "the operative fact was whether the property interest had potential economic value that was worthy of pursuit by the creditor").

## III. CIRCLE AT LEAST NEGLIGENTLY VIOLATED THE RESTRAINING NOTICE

By all accounts, Circle did not even attempt to comply with the restraining notice. But Circle nonetheless contends that it cannot be liable for violating the notice because it was not "afforded [] a commercially reasonable opportunity to restrain any North Korean USDC," Dkt. 25 at 18. This Court cannot grant the motion to dismiss on this ground, however, because this is an argument Circle must make to a jury. The pleaded facts show that Circle acted unreasonably.

Under New York law, "there must at least be a showing of negligence in failing to comply with the restraining notice." *Security Trust Co. of Rochester v. Magar Homes*, 92 A.D.2d 714, 715 (N.Y. App. Div. 1983). Whether a party acted unreasonably is a question of fact, *see S & S Mach. Corp. v. Mfrs. Hanover Tr. Co., N.A.*, 219 A.D.2d 249, 254 (N.Y. App. Div. 1996) ("[r]easonableness, especially the reasonableness of a party's conduct, has been held to be a question of fact"), and the Complaint contains detailed allegations permitting the inference that Circle chose not to restrain North Korean assets after it had both months to prepare for the foreseeable arrival of North Korean assets, ¶¶ 27, 29–32, 145, and ample real-time warning that North Korea possessed USDC, ¶¶ 118–22, 139–44. Indeed, Circle's argument that it did not have a "commercially reasonable opportunity" to restrain the assets flatly contradicts its own sworn statements, detailed in the Complaint, that

it does not investigate North Korean ownership of USDC *at all*. ¶¶ 148–50. So according to Circle's own statements, it wouldn't have mattered if North Korea held the USDC for a day, a month, or a year—Circle would ignore the restraint regardless.

This early notice and these public warnings distinguish this case from *Zemo Leasing Corp. v. Bank of N.Y.*, on which Circle relies, *see* Dkt. 25 at 18–19, where the garnishee was served with the restraining notice only the day before the judgment debtor withdrew the funds to be restrained. 158 Misc. 2d 991, 993 (Sup. Ct., Rockland County, 1993); *see also Sanchez v. State of New York*, 99 N.Y.2d 247, 254 (2002) (explaining that negligence turns in part on what the defendant "reasonably should have known . . . based on the institution's expertise or prior experience"). And, when the Drift exploit occurred, there were ample warning signs, in real time, that North Korea was behind the heist. ¶¶ 139–43 (describing North Korea's laundering patterns and the similarities between those patterns and the Drift exploit); ¶¶ 119–22 (detailing public warnings that a massive hack was occurring). Circle ignored them, and that is at least negligent.

Circle does not contest that the pleaded facts plausibly establish that it had sufficient time to freeze North Korea's USDC. In response to public outcry over Circle's willful blindness, its Chief Strategy Officer did not say that it *could not* have frozen the USDC but instead stated that Circle freezes USDC only when "legally compelled by an appropriate authority, through lawful process," and its CEO likewise said Circle acts only at the direction of law enforcement or courts. ¶¶ 146–47.

## IV. PLAINTIFFS WERE DAMAGED BY CIRCLE'S FAILURE TO RESTRAIN NORTH KOREAN ASSETS

As a last resort, Circle argues that, even if permitting North Korea to transact with hundreds of millions of dollars of USDC did violate the restraining notice, the Court should nevertheless dismiss Plaintiffs' complaint because Plaintiffs suffered no damage. *See* Dkt. 25 at 19–21. In Circle's view, Plaintiffs suffered no harm because they could neither obtain a turnover order against Circle, nor obtain USDC through any judicial process against North Korea or those frozen assets.

Circle is mistaken based on both the well-pleaded facts and its own recent admissions and actions in similar cases. Had Circle frozen North Korea's USDC, Plaintiffs could have sought turnover of either the frozen USDC itself or the fiat reserves underlying it, both of which are within Circle's possession or custody and thus capable of turnover. ¶ 154; *see also* Dkt. 4, *Kim v. Democratic People's Republic of Korea*, No. 25-mc-527 (S.D.N.Y., Dec. 12, 2025) (moving for turnover of North Korean assets in Circle's possession). And unlike the garnishee in *Northern Mariana*, Circle would not have needed to compel some separate foreign entity to produce the property, because Circle itself controls the USDC smart contract, can freeze and mint USDC, and possesses the fiat reserves backing the tokens. ¶¶ 45–47, 60–63, 67–69. Thus, once the USDC was frozen, this Court could have ordered Circle to turn over the value represented by that property—whether by transferring the corresponding fiat reserves or by using its own technical authority to extinguish the frozen USDC and issue equivalent USDC to Plaintiffs.

Circle's argument to the contrary blinkers reality. As discussed previously, Circle reached an agreement with the Department of Justice to comply with freezing and turnover orders through "a mechanism for compensating victims in federal investigations through Circle's voluntary agreement to issue new USDC as a substitute for USDC subject to a final order or judgement of forfeiture and a permanent blocklisting order." Ex. D, Motion to Dismiss at 7 n.7, *State v. Circle Internet Financial* (Wis. Cir. Ct. Walworth County, filed June 30, 2026). It has acquiesced in a similar freeze and reissue of 381,000 USDC pursuant to a Wisconsin court order and threat of contempt for failure to comply. *See* Ex. D, Motion to Dismiss at 7 n.7, *State v. Circle Internet Financial* (Wis. Cir. Ct. Walworth County, filed June 30, 2026). And the January letter from New York's top law enforcement officials reveals that here in New York, Circle reached a similar agreement with law enforcement to freeze, forfeit, and "return the USD equivalent to victims" of crime, though as of that writing, Circle had apparently "reneged on their agreement." *Letter from Letitia James, Att'y Gen. of N.Y., et al., to Charles E. Schumer, U.S. Sen., et al.*, at 5 (Jan. 26, 2026), https://ag.ny.gov/sites/default/files/letters/letter-to-congress-stablecoin-legislation-2026.pdf. Circle does not explain why that very same thing would not result here. At this early stage, then, Plaintiffs have at least plausibly alleged that Circle's willful noncompliance with the restraining notice damaged them greatly.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Circle's motion to dismiss in its entirety.

Respectfully submitted,

*<u>/s/ Jeremy Shur</u>*
Jeremy Shur
GERSTEIN HARROW LLP
1319 F St NW, Suite 301
Washington, DC 20004
jeremy@gerstein-harrow.com
(202) 670-4809

*<u>/s/ Charles Gerstein</u>*
Charles Gerstein
GERSTEIN HARROW LLP
1319 F St NW, Suite 301
Washington, DC 20004
charlie@gerstein-harrow.com
(202) 670-4809

*<u>/s/ Jason Harrow</u>*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*<u>/s/ Robert Tolchin</u>*
Robert Tolchin
THE BERKMAN LAW OFFICE LLC
829 E. 15th Street, Suite Seven
Brooklyn, New York 11230
rtolchin@berkmanlaw.com
(718) 855-3627

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I hereby certify that, according to the word-count function on Microsoft Word, the foregoing memorandum of law (excluding the caption, tables, and signature blocks) contains 8,045 words.

*/s/ Jeremy Shur*
Jeremy Shur
GERSTEIN HARROW LLP
1319 F St NW, Suite 301
Washington, DC 20004
jeremy@gerstein-harrow.com
(202) 670-4809